United States Court of Appeals,

Fifth Circuit.

No. 90–4907.

Joseph A. DAZZIO, Petitioner,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.

Sept. 1, 1992.

Petition for Review of an Order of The Federal Deposit Insurance Corporation.

Before REYNALDO GARZA and GARWOOD, Circuit Judges, and MAHON,[*] District Judge.

RWOOD, Circuit Judge:

For the second time, petitioner Joseph S. Dazzio (Dazzio) appeals the assessment of a civil money penalty against him by the respondent Federal Deposit Insurance Corporation (FDIC) for banking regulation violations. Finding that the FDIC, in light of our earlier remand of this case, has abused its discretion in making its latest assessment of Dazzio's penalty, we reverse and (again) remand.

**Facts and Proceedings Below**

The facts surrounding Dazzio's involvement in the insider transaction that led to the instant banking regulation violations are set forth in this Court's prior opinion in this case, *Bullion v. FDIC,* 881 F.2d 1368 (5th Cir.1989). Briefly, Dazzio was chairman of the board of the Metropolitan Bank & Trust Company of Baton Rouge (the Bank), which exceeded the insider lending limits contained in Regulation O, 12 C.F.R. § 215, by lending $1.5 million in November 1985 to a partnership controlled by Dazzio. In *Bullion,* this Court concluded that Dazzio and others had violated the lending limits set forth in 12 C.F.R. §§ 215.4(c) & 215.2(f), and the prohibition against unsound loans to insiders set forth in 12 C.F.R. § 215.4(a).

---

[*]Senior District Judge of the Northern District of Texas, sitting by designation.

That Dazzio participated in the violations of the aforementioned regulations is no longer challenged. Rather, this appeal concerns the determination of the amount of the civil money penalty assessed by the FDIC against Dazzio for these violations. We accordingly outline the relevant facts, proceedings, and decisions relating to the penalty determination through the history of this case.

On April 8, 1987, the FDIC issued a Notice of Assessment of Civil Money Penalties requiring Dazzio to pay $290,000.[1] Dazzio filed a request for hearing to challenge the assessment and a hearing was held before an administrative law judge (the First ALJ) on July 27–30, 1987. On January 23, 1988, the First ALJ issued his recommended decision and order (the First ALJ Decision).

As a guide in determining the amount of a civil money penalty for banking regulation violations, section 2[18](j) of the Federal Deposit Insurance Act, 12 U.S.C. § 1828(j)(4)(B) provided that:

> "In determining the amount of the penalty the Corporation shall take into account the appropriateness of the penalty with respect to the size of financial resources and good faith of the member bank or person charged, the gravity of the violation, the history of previous violations, and such other matters as justice may require."[2]

The First ALJ Decision found that although the violation in this case was grave, the FDIC had not alleged personal dishonesty or concealment on the part of any of the respondents and that all had acted in good faith to correct the violations as quickly as possible. The ALJ specifically noted that the FDIC had not alleged that the loan to Dazzio's company had been made at terms which were in any way preferential to those offered other, non-insider borrowers for similar transactions. The FDIC

---

[1]Other respondents, Dazzio's fellow directors, were assessed $3,000 penalties for their participation in the Regulation O violations at the Bank.

[2]The provisions of section 1828(j)(4) were amended in 1989 by section 907(c) of FIRREA, Pub.L. 101–73, 101st Cong. 1st Sess., August 9, 1989. As it is not claimed that FIRREA governs this case, our references throughout this opinion will be to section 1828(j)(4) as it existed at the time of the violations in question and prior to FIRREA. We observe, however, that the same penalty factors apparently continue to be listed. *See* 12 U.S.C. §§ 1818(i)(2)(G), 1828(j)(4)(E).

has never, throughout the history of this case, challenged this finding by the First ALJ. The First ALJ accordingly concluded that the respondents had violated only the lending limit provisions of 12 C.F.R. §§ 215.4(c) & 215.2(f), and had not violated either the prohibition on preferential terms or the above-average risk of repayment prohibition contained in 12 C.F.R. § 215.4(a).

Further, the First ALJ found that the FDIC had not alleged any prior banking regulation violations by the respondents. Finally, the First ALJ found that Dazzio had no ability to pay a substantial money penalty at that time because of the deterioration of his business enterprises.[3] However, the First ALJ also found that Dazzio would probably have, in the future, an ability to pay some money penalty. Consequently, the First ALJ recommended a $10,000 penalty against Dazzio.[4]

The Board of Directors of the FDIC (the Board[5]) reviewed the First ALJ Decision and issued its decision (the First Board Order) on May 24, 1988. In this decision, the Board found that because the loan represented an above-average risk of repayment, the respondents had, in fact, violated 12

---

[3]Most of Dazzio's net worth had been concentrated in real estate ventures and in holdings of the Bank's stock. Though the First ALJ had before him financial statements and tax returns dating from 1985 and 1986 that estimated Dazzio's personal wealth at up to $2.2 million in 1985 and $900,000 in 1986, Dazzio provided testimony at the hearings that most of those assets were, by the time of the hearing, either worthless or had been foreclosed upon to satisfy underlying debt. The First ALJ found Dazzio's testimony and supporting documentation to be credible.

[4]We must note, however, that the First ALJ's determination of the amount of an appropriate penalty was based on his conclusion that Dazzio was guilty of only the lending limit violations under 12 C.F.R. §§ 215.4(c) & 215.2(f). The First ALJ determined that because the FDIC had never alleged that the terms of the loan to Dazzio's company were preferential, no violation of 12 C.F.R. § 215.4(a) had occurred. The First ALJ's interpretation of section 215.4(a) was found to be erroneous by the FDIC and by this Court on the prior appeal. *Bullion, supra,* 881 F.2d at 1374.

[5]Hereinafter, when referring to the FDIC in its capacity as Dazzio's adversary and proponent of the civil penalty, we will use the term "FDIC," and when referring to the Board of Directors of the FDIC in its adjudicatory capacity in deciding this controversy we will use the term "Board."

     Of course, the Board, in rendering a decision in matters such as this, is to sit as a neutral fact finder and decision maker, not as an advocate of agency enforcement. The Board is to show no favoritism toward its own examiners and counsel, nor animus toward the respondent. In analyzing the tone and argument in both decisions of the Board, we regretfully cannot escape the impression that the Board has inappropriately blurred the line between adversary and adjudicator.

C.F.R. 215.4(a) as well as the lending limit provisions of 12 C.F.R. §§ 215.4(c) & 215.2(f).[6]

In assessing a money penalty against Dazzio, the Board noted that section 2[18](j) of the Federal Deposit Insurance Act, 12 U.S.C. § 1828(j)(4)(A) provided for a maximum penalty of $1,000 per violation per day for each day during which the violation continues.[7] The maximum penalty as found by the Board was $511,000.[8]

The Board further found that Dazzio had "profited" in the gross amount of $209,000 from the Bank's loan because he had used the proceeds of the loan to repay debt bearing a higher interest rate, and because his company received rent payments from the property. At the same time, the Board found that the borrower's expenses of maintaining the property that the Bank's loan had financed were approximately $34,000. Thus, the Board found that Dazzio had realized a net gain of $175,000 from the transaction.

The Board found that a penalty in the amount of Dazzio's personal gain would be appropriate,[9] but ultimately reduced the penalty to $125,000, citing the lack of dishonesty on the part

---

[6]The Board did specifically find, however, that the loan to Dazzio's company did *not* contain any preferential terms.

[7]In this case, though the parties treated the transaction that resulted in the Regulation O violations as a loan, the transaction was actually a purchase of state-sponsored, low-interest bonds. To correct the violation by decreasing the Bank's indebtedness on the transaction to within the Regulation O limits, the bonds had to be reissued and "participated out" to other banks, a process that took a significant amount of time. Further, due to an initial error by the FDIC bank examiner who discovered the violations, the bank had to go through this process twice, which added significantly to the time it took the bank to correct the violations and significantly increased the statutory maximum penalty.

[8]The calculation of the maximum possible statutory penalty was not challenged on the initial appeal to this Court. *Bullion v. FDIC, supra,* at 1378 n. 19.

[9]Though the violator's personal gain from the violation is not a statutory factor listed in section 1828(j)(4)(B), it is included in the Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies, 45 Fed.Reg. 59423 (1980). This policy states that:

"In assessing a civil money penalty under the various FIRA provisions, the

of any of the respondents, the lack of prior Regulation O violations, and the good faith of the respondents in acting to correct the violations when they became aware of them.

Dazzio appealed the First Board Order to this Court in *Bullion v. FDIC, supra.* In an opinion dated September 5, 1989, the panel in *Bullion* sustained the Board's finding that Dazzio and the other respondents had violated the above average risk of repayment prohibition of 12 C.F.R. § 215.4(a) as well as the lending limit violations. *Bullion, supra,* 881 F.2d at 1376. The panel further held that, although "[w]e do not conclude that the amount of this penalty constitutes an abuse of discretion," the Board had failed to give the factor of Dazzio's ability to pay proper consideration in its penalty determination. *Id.* at 1378–79. The panel also noted that "[t]he Board's harsh stance with Dazzio coupled with the Board's lenience with FDIC's counsel in its failure to produce requested documents further sheds light on the possible arbitrariness and inconsistency in its decision." *Id.* at 1379.[10] The panel remanded the case, stating:

> "On remand the Board is direct ed to develop detailed findings that evince a thorough evaluation of all factors which under the statute must enter into the penalty which the Board assesses upon its reconsideration." *Id.* at 1379.

and

> "As to Dazzio, we remand for the Board to reconsider the proper amount of penalty and findings to support its conclusion." *Id.* at 1380.

On remand, the Board, by its order of December 12, 1989, again referred the matter to an

---

> agencies are required to consider the size of the financial resources and good faith of the respondent, the gravity of the violation, the history of previous violations, and such other matters as justice may require. In determining the amount of a civil money penalty, the agencies believe that a significant consideration should be the financial or economic benefit the respondent obtained from the violation. Accordingly, the agencies will consider, in addition to the other factors specified in the statute, the financial or economic benefit the respondent derived from the illegal activity."

[10]We had noted earlier in the opinion that FDIC's counsel had engaged in conduct that "was clearly an abuse of discovery" and "might be appropriate for some form of sanctions." *Id.* at 1377 n. 15.

administrative law judge (the Second ALJ; not the same individual as the First ALJ) with instructions to accept evidence from the parties solely on the issue of Dazzio's ability to pay. Further, the Second ALJ was directed by the Board's order to fully consider all of the statutory factors and make a penalty recommendation, under the condition that the Second ALJ was to accept the Board's earlier conclusions with respect to the statutory factors other than ability to pay. The Board's December 12, 1989, order also directed Dazzio to produce various of his financial records for review by the FDIC and consideration by the Second ALJ.

Thereafter, at a one-day hearing on March 27, 1990, the FDIC presented the testimony of one of its bank examiners who had reviewed the financial records submitted by Dazzio. The substance of the examiner's direct examination testimony was that the records submitted by Dazzio were insufficient to form the foundation of an analysis of Dazzio's ability to pay a civil money penalty. The examiner's objections were based largely on the fact that Dazzio's financial records were not in the form of a detailed current financial statement that could then be verified by the examiner. In his own defense at the hearing, Dazzio took the stand and orally chronicled his financial status.

The Second ALJ issued a decision (the Second ALJ Decision) on July 10, 1990. The Second ALJ found Dazzio to be remarkably lacking in cooperation, stating that Dazzio had not complied with the Board's order because he had not prepared a current, detailed financial statement for the hearing. We observe, however, that the Board's December 12, 1989, order did not purport to require or direct Dazzio to prepare or cause to be prepared any financial statement or listing of assets and liabilities, but rather required him to produce various classifications of existing documents.[11] Nevertheless, the

_____

[11]The Board's December 12, 1989, order stated that Dazzio "shall produce for the record" various types of documents described in eight paragraphs, each beginning with the words "[a]ny and all [or simply "All"] documents," usually followed by the phrase "which evidence or refer to in any way" Dazzio's ownership or interest in various kinds of property, or transfers made by him, or the like. One of the paragraphs reads as follows: "E. Any and all documents dated on or after January 1, 1986 which set forth in any way the Respondent's net worth or which were used by Respondent in any way as evidencing his net worth." This is the closest thing to a reference to a financial statement or complete listing of assets and liabilities, and clearly refers to producing a document or documents that may be in existence, rather than to creating or causing to be created

Second ALJ concluded that Dazzio had a minimal current ability to pay a civil money penalty.[12]  The Second ALJ also concluded that Dazzio's involvement in selling commercial real estate in Florida (which up to that time had not produced any income, according to Dazzio's testimony) could yield a future ability to pay a penalty.[13]

In assessing a recommended penalty, the Second ALJ found that Dazzio had an ability to pay a penalty of no more than $10,000.  The Second ALJ further found that Dazzio had acted in good faith to correct the Regulation O violations at the time they were brought to his attention.  Further, the Second ALJ found that Dazzio had no history of prior violations.  On the other hand, the Second ALJ found that the Regulation O violations committed by Dazzio and the other directors were grave and had yielded a net profit to Dazzio of $175,000 (this finding appears merely to restate the Board's earlier finding in this respect).  The Second ALJ concluded that the most appropriate penalty would be the disgorgement of this $175,000 profit.

The Board considered the Second ALJ Decision and rendered its second Decision and Order (the Second Board Order) on November 13, 1990.  In that decision, the Board found that regardless

---

such a document.

> The Second ALJ, while noting Dazzio's uncooperativeness, never stated that Dazzio had not provided all of his financial records that were in existence at (or after) the time of the Board's December 12, 1989, order.  Nor did the Board ever make any such finding.  Nor did either ever find that Dazzio ever destroyed any documents.
>
> Finally, though the Second ALJ characterized Dazzio's testimony as "evasive" and "less than forthcoming," he correctly noted that there was no contrary evidence presented by the FDIC that Dazzio had any assets from which he could satisfy a money penalty.

[12]The Second ALJ erroneously stated in his decision that Dazzio may have had a $300,000 certificate of deposit and $174,000 in an escrow account among his assets as shown on Dazzio's 1985 and September 1986 financial statements.  The Second ALJ evidently was not familiar with the record established at the hearing before the First ALJ, where the testimony clearly reflects that these assets had been liquidated to partially pay the loan that had been the cause of the Regulation O violations and other indebtedness of Dazzio.  The Board did not correct these errors.

[13]Dazzio was also employed part-time as a supervisor in a hospital cafeteria, which yielded an income of approximately $600 per month.

of Dazzio's present ability to pay a monetary penalty, a substantial penalty could be assessed. The Board went even further, though, and concluded that, presumably by its December 12, 1989, order, it "had placed on Respondent [Dazzio] the burden of producing evidence to establish his financial condition" and that because he had failed to discharge that burden, it was proper to conclude that he could pay a substantial penalty, and rejected the Second ALJ's finding that Dazzio had the ability to pay only a $10,000 penalty.

The Second Board Order further stated that the Regulation O violations were very grave, and that Dazzio was no longer entitled to a finding of good faith in correcting the violations due to "his failure to fully cooperate" in furnishing information concerning his ability to pay a penalty. The Board did, however, agree that Dazzio had not previously been involved in banking regulation violations and that this factor should be considered in mitigation. The Board concluded, though for different reasons than the Second ALJ, that Dazzio should be assessed a penalty of $175,000.

Dazzio now appeals the Second Board Order to this Court asserting, among other things, that in various respects the Board's action is arbitrary and capricious and an abuse of discretion.

## Discussion

As we stated in *Bullion,* the findings of the Board will generally be set aside only if found to be unsupported by substantial evidence on the record as a whole. *Bullion, supra,* 881 F.2d at 1372. The remedies and penalties directed by the agency will likewise normally not be disturbed unless they constitute an abuse of discretion or are otherwise arbitrary and capricious. *Id.* As *Bullion* reflects, however, if the Board does not properly consider the evidence in relation to the appropriate statutory factors, remand may be required.

Section 308.07 of the Rules of Practice and Procedures of the Federal Deposit Insurance Corporation, 12 C.F.R. § 308.07(a), requires that all proceedings held by an administrative law judge

assigned by the Board to make findings and recommendations be conducted "in accordance with the provisions of the Administrative Procedure Act (5 U.S.C. 554 through 557) and other applicable law." *See also* section 1828(j)(4)(C), (D), & (F). According to 5 U.S.C. § 556(d), with regard to factual matters, "the proponent of a rule or order has the burden of proof." Courts have made clear, however, that "burden of proof" as used in section 556(d) refers only to the burden of going forward with evidence, not the ultimate burden of persuasion. *Merritt v. United States,* 960 F.2d 15, 17 (2d Cir.1992) (citing *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 403 n. 7, 103 S.Ct. 2469, 2475–76 n. 7, 76 L.Ed.2d 667 (1983)).

*Merritt* concerned the Federal Maritime Commission's assessment of a civil penalty for violations of the Shipping Act of 1984. The respondent in that case had avoided participating in the hearings and proceedings that led to the assessment of a substantial penalty, while all the time alleging his inability to pay any fine. In making findings and recommendations, the administrative law judge in *Merritt* particularly noted the petitioner's lack of cooperation. The penalty statute applied in *Merritt* was Section 13(c) of the Shipping Act of 1984, 46 U.S.C.App. § 1712(c), which states, in part:

> "In determining the amount of the penalty, the Commission shall take into account the nature, circumstances, extent, and gravity of the violation committed and, with respect to the violator, the degree of culpability, history of prior offenses, ability to pay, and such other matters as justice may require."

The Second Circuit held that the Federal Maritime Commission, as proponent of the penalty assessment, had the burden of going forward with evidence on all the statutory factors—including ability to pay. As the court stated:

> "If Congress had intended a different result [than placing the burden of proof on the proponent] when a defendant's lack of resources is an issue, it could have written inability to pay a fine into the statute as an affirmative defense and shifted the burden of going forward with evidence onto the defendant. Congress did not do that." *Merritt, supra,* 960 F.2d at

18.[14]

Obviously, the penalty provisions of the Shipping Act quoted above are analogous to those in section 1828(j)(4)(B), and we therefore agree with and apply here the Second Circuit's reasoning in *Merritt.*

Here, the Board has essentially relied on Dazzio's refusal to construct a detailed financial statement in concluding that he must have sufficient assets to be able to pay a substantial penalty. Each of the evidentiary points listed by the FDIC in support of its conclusion that Dazzio could pay a substantial money penalty were addressed and rebutted by Dazzio in the hearing before the Second ALJ. After that hearing, the Board could point to no evidence—aside from two obviously out-of-date financial statements, the inapplicability of which the record evidence demonstrates—that Dazzio had the financial ability to pay a $175,000, or even a $50,000, penalty. The FDIC in no way satisfied its burden of production of evidence.

We do not hold that in weighing the evidence the Board may not employ the recognized principle that a party's failure to produce evidence under his control may, in an appropriate instance, give rise to a permissive inference that the evidence would be unfavorable to that party. But this does not justify changing the statutory burden of production, which is precisely what the Board did here, as the Second Board Order states that "the Board placed on him [Dazzio] the burden of producing evidence to establish his financial condition." Moreover, the record does not reflect, and neither the Board nor the Second ALJ ever found, that Dazzio had failed to produce any record or document called for by the Board's December 1989 order that was then or at any time thereafter in existence and subject to Dazzio's control or that Dazzio ever destroyed any relevant documents or the like. Indeed, nothing in the Board's December 1989 order fairly put Dazzio on notice that the FDIC was to be relieved of its burden of producing evidence.

---

[14]The *Merritt* court also relied upon a similar decision by the Ninth Circuit in *Bosma v. United States Dep't of Agriculture,* 754 F.2d 804 (9th Cir.1984).

The Second Board Order also states that even apart from Dazzio's failure to carry his supposed burden of producing evidence, the record reflects that he has the ability to pay a substantial penalty. The order states in this connection that "[t]he record establishes substantial assets listed in Respondent's 1985 financial statement. In the absence of evidence showing the disposition of those assets, the Board can only conclude that they continue to be assets of the Respondent." From this statement, which wholly ignores the evidence at both hearings concerning what happened to Dazzio's assets on his 1985 financial statement,[15] it appears that the Board has essentially ignored our earlier remand order. Our prior opinion faults the Board for having "seemingly ignored the evidence in the record" showing that Dazzio did not even have any substantial amount of the assets on his 1986 financial statement, which were well less than half those on the 1985 statement. *Bullion* at 1379.[16] Despite our remand, the Board has continued to ignore and fail to address this evidence.

The Second Board Order also states that decisions, such as *United States v. Atkinson,* 788 F.2d 900, 904 (2d Cir.1986), construing ability to pay as a factor in fixing restitution orders under the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. former §§ 3579, 3580, "apply with equal force here."[17] The Board, however, overlooks the fact that the VWPA provisions are

---

[15]The 1985 statement showed a net worth of some $2.2 million for Dazzio and his wife. This included some $1.4 million in real estate, which was subsequently foreclosed on, $847,000 worth of stock in the Bank, which the FDIC concluded "was close to zero in value" when the loan was made (*Bullion* at 1375) and which thereafter became wholly worthless when the Bank failed, and $300,000 in a CD and $174,000 in an escrow account in connection with the challenged loan, which amounts were applied to indebtedness of Dazzio's, including the loan.

[16]We also observed that the Board inconsistently "discounted Dazzio's financial statements for purposes of finding a Regulation O violation, but gave them face value for purposes of the assessment of a fine." *Id.*

[17]These provisions have since been repealed. Former section 3580(a) and (d) provided:

> "(a) The court, in determining whether to order restitution under section 3579 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.
>
> "....

*restitutionary,* that is, they are to compensate a victim for a loss, while the section 1828(j)(4) assessment is *punitive* in nature, and does not depend on any loss, nor does section 1828(j)(4)(B), unlike section 3580(a), expressly list loss or amount of loss as a factor. Dazzio, who guaranteed the loan, remains fully liable to the Bank and its receiver for all loss suffered on the loan. Were this a restitutionary order, payment would be to the victim (the Bank or its receiver), instead of to the Treasury, section 1828(j)(4)(G), and any amount paid would reduce *pro tonto* Dazzio's liability to the Bank or receiver. Here, however, Dazzio is liable both to make the Bank or receiver whole and to pay the full penalty.[18] The Board thus erred in giving Dazzio's financial resources the same consideration as would have been given under the VWPA.

Dazzio also justly complains of the increase in the penalty assessed against him from the First Board Order to the Second Board Order without adequate justification in the record evidence or

---

"(d) Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant and such defendant's dependents shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires."

Former section 3579(e) provided in part:

"(e)(1) The court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation, except that the court may, in the interest of justice, order restitution to any person who has compensated the victim for such loss to the extent that such person paid the compensation....

"(2) Any amount paid to a victim under an order of restitution shall be set off against any amount later recovered as compensatory damages by such victim in—

"(A) any Federal civil proceeding; and

"(B) any State civil proceeding, to the extent provided by the law of that State."

[18]Further, section 3580(d) expressly places the burden of proof on the defendant with respect to his financial resources and needs, while the contrary is the situation under section 1828(j)(4)(B).

proper explanation by the Board. The first time around, the Board assessed a penalty of $125,000. The Second ALJ Decision and Second Board Order, however, raised that penalty to $175,000. Between those two decisions, there has been no change in the record that would indicate the appropriateness of an increase in penalty. According to the evidence adduced in the hearing before the Second ALJ, Dazzio's net worth and ability to pay has most likely decreased, not increased, in the interim. Neither the Second ALJ Decision nor the Second Board Order finds otherwise. With regard to the other statutory penalty factors, pursuant to the Board's December 1989 order no additional evidence was produced in the hearing before the Second ALJ.

In the First Board Order, the Board determined Dazzio's alleged profit from the loan transaction at issue to be $175,000 and found that it would be appropriate to assess a penalty in this amount. The Board then reduced this amount due to Dazzio's lack of dishonesty and lack of prior violations, and due to his good faith effort to promptly correct the lending limit violations after they were discovered by the bank examiners. It accordingly assessed a penalty of $125,000.

In the Second Board Order, the Board asserted that the "profit" that Dazzio should be made to give up was $209,000, and that such amount should be reduced to $175,000 in recognition of Dazzio's lack of previous regulatory violations. The Board found that Dazzio was no longer entitled to a reduction for "good faith" because "Respondent's failure to fully cooperate constitutes bad faith which neutralizes any benefit from prior cooperation."

The Board provides no sound evidentiary explanation, and we are at a loss to divine one, as to why the penalty assessed against Dazzio should have increased by $50,000 between the First and Second Board Orders. This looks to us uncomfortably like judicial vindictiveness, or "charging for the use of the courthouse." *See North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

The Board's finding in the Second Board Order that Dazzio benefited in the amount of $209,000 may have been merely an oversight. In the First Board Order, the Board calculated Dazzio's gross benefit from the loan transaction to have been $209,000, but also stated that Dazzio had incurred expenses in the amount of $34,000 which yielded a net "profit" to him of $175,000. The Board gives no explanation for choosing the gross benefit figure in its Second Board Order where it had adopted the net figure earlier.

Further, no evidence was introduced that in any way contradicted the Board's earlier finding that Dazzio and the other members of the Bank's board of directors had acted in good faith in correcting the lending limit violations as quickly and efficiently as possible under the circumstances. Instead, the Board found that Dazzio's uncooperativeness at the ALJ hearings (principally the second) cancelled out any mitigating effect provided by the previous determination of good faith.

The Second Board Order states that "the Board specifically finds that Respondent did not act in good faith *because* of his intransigent refusal to provide adequate financial information" (emphasis added). Earlier in the Second Order the Board explained:

> "... The ALJ ... determined that the good faith factor "operates in the Respondent's favor.' The Board, however, finds that Respondent's failure to provide appropriate documentation sufficient to allow an accurate evaluation of his financial resources in compliance with the specific requirements of the Board's Order of December 12, 1989, coupled with his failure to provide financial information requested by subpoena in the prior [ALJ] proceeding ... strongly weighs against a finding of Respondent's "good faith.' The Board concludes that Respondent's failure to fully cooperate constitutes bad faith which neutralizes any benefit from prior cooperation." (Footnote omitted).

We hold that the Board erred in law in this respect. It is evident from the structure of section 1828(j)(4) that the penalty factors set out in section 1828(j)(4)(B)—including "good faith"—are equally applicable to the initial assessment of the penalty under section 1828(j)(4)(A) as to the resolving of any challenges under sections 1828(j)(4)(C) & (D) to the amount so assessed.[19] It is

_____

[19]Section 1828(j)(4) provides in relevant part:

evident, therefore, that intransigence in contesting an assessed penalty—as distinguished from lack

of cooperation in the investigation of and efforts to rectify a violation—is not relevant to the "good

faith" that the statute lists as a factor to be taken into account in determining the amount of the

---

"(4)(A) Any nonmember insured bank which violates or any officer, director, employee, agent, or other person participating in the conduct of the affairs of such nonmember insured bank who violates any provision of section 371c, 371c–1, or 375b of this title, or any lawful regulation issued pursuant thereto, or any provision of section 377 of this title, shall forfeit and pay a civil penalty of not more than $1,000 per day for each day during which such violation continues: *Provided,* That the Corporation may, in its discretion, compromise, modify, or remit any civil money penalty which is subject to imposition or has been imposed under authority of this subsection. The penalty may be assessed and collected by the Corporation by written notice. As used in this section, the term "violates' includes without any limitation any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation.

"(B) In determining the amount of the penalty the Corporation shall take into account the appropriateness of the penalty with respect to the size of financial resources and good faith of the member bank or person charged, the gravity of the violation, the history of previous violations, and such other matters as justice may require.

"(C) The nonmember insured bank or person charged shall be afforded an opportunity for agency hearing, upon request made within ten days after issuance of the notice of assessment. In such hearing all issues shall be determined on the record pursuant to section 554 of Title 5. The agency determination shall be made by final order which may be reviewed only as provided in subparagraph (D). If no hearing is requested as herein provided the assessment shall constitute a final and unappealable order.

"(D) Any nonmember insured bank or person against whom an order imposing a civil money penalty has been entered after agency hearing under this section may obtain review by the United States court of appeals for the circuit in which the home office of the member bank is located, or the United States Court of Appeals for the District of Columbia Circuit.... The findings of the Corporation shall be set aside if found to be unsupported by substantial evidence as provided by section 706(2)(E) of Title 5.

"(E) If any nonmember insured bank or person fails to pay an assessment after it has become a final and unappealable order, or after the court of appeals has entered final judgment in favor of the agency, the Corporation shall refer the matter to the Attorney General, who shall recover the amount assessed by action in the appropriate United States district court. In such action the validity and appropriateness of the final order imposing the penalty shall not be subject to review."

penalty.[20] Nor did our remand order contemplate that the statutory "good faith" factor would be assessed in the light of Dazzio's cooperation at some future hearing on this penalty.

Moreover, the Board, in directing the Second ALJ to take additional evidence on Dazzio's ability to pay, intentionally limited the parties to presentation of evidence on that issue alone. The Second ALJ cited this directive from the Board as authority to prevent Dazzio from further developing the record on any other issues. For the Board to use Dazzio's uncooperativeness at the hearing before the Second ALJ as the evidentiary basis for modifying its earlier finding of good faith seems to us patently unfair. The Board, in essence, blindsided Dazzio by considering additional evidence regarding an issue on which the Board had declared the record closed.

Therefore, we reject the Board's determination that Dazzio's uncooperativeness at the hearings to contest the penalty assessed against him has any bearing on the Board's earlier determination that his good faith at the time the violations were discovered, and in the investigation and attempted correction thereof, weighed in his favor respecting the amount of the penalty. We hold that the Board erred in assessing a greater penalty on remand without either legally adequate explanation or new evidence tending to justify a higher penalty. We also hold that the Board erred in determining that Dazzio was not entitled to have his unquestioned "good faith" in the legally relevant sense considered in his favor because he was not cooperative at the second (and, to a lesser extent, the first) ALJ penalty hearing with respect to furnishing documentary information as to his ability to pay a civil penalty.

Since the matter must be remanded in any event, we also note certain deficiencies in the Board's determination that Dazzio "profited" from the loan transaction that resulted in the violations. The Board determined that because the loan from the Bank was at a lower interest rate than the loan

---

[20]Further, the Board's inference that Dazzio violated its December 1989 order is unsupported by the record or by any specific finding.

it replaced, Dazzio profited by approximately $73,600. Further, the Board determined that Dazzio had collected approximately $127,000 in rent on the property financed by the loan and had benefitted from payment of taxes by the bond trustee in the amount of $8,500. From these factors, the Board concluded that Dazzio had realized a gross "profit" of $209,000.

The Board has failed to address several salient facts, however. As the First ALJ Decision makes clear, the FDIC has never suggested that the loan Dazzio's company received from the Bank had a lower interest rate, or any other preferential term, than would have been offered for a similar transaction to a non-insider. Dazzio's "profit" from the lower interest rate, therefore, was not at the expense of the Bank, which received the market rate of interest on the bonds it purchased. Rather, Dazzio benefitted from the lower interest rate because his company was able to qualify for the low-interest housing bonds that were purchased by the Bank.

The Board may have decided that without the loan from the Bank, Dazzio's company could never have received the bond proceeds, and that the loan was approved by the Bank despite incomplete documentation and a greater-than-normal risk of repayment (the 12 C.F.R. § 214.5(a) violation). Therefore, one may argue, Dazzio really did "profit" from the loan. However, in this case, Dazzio personally guaranteed the loan to the Bank. Thus, Dazzio did not stand to make a dime from the transaction until the Bank had recovered the full measure of the value of its loan. Thus, if the Bank did not profit from the loan, Dazzio could not either. Furthermore, the record clearly discloses that a significant portion of Dazzio's wealth at the time of the loan transaction was comprised of stock in the Bank. The conclusion that Dazzio actually profited from the loan transaction is, in reality, simply untrue. Therefore, whatever else may have justified imposing a civil penalty on Dazzio, the Board's contention that an appropriate penalty was one that forced Dazzio to disgorge his gains from the transaction was not appropriate in this particular case in light of the record as a whole.[21]

---

[21]We reject Dazzio's claims for reversal based on denial of discovery and subpoenas. To the extent that these claims are not adequately dealt with in our prior opinion, they are without merit and warrant no discussion. We similarly reject Dazzio's complaint concerning the change in the

## Conclusion

We reverse the Board's assessment of a civil money penalty in the amount of $175,000 against Dazzio and remand this case for further consideration of the appropriate penalty in accordance with this opinion.

REVERSED AND REMANDED.

---

identity of the ALJ.